Judges of the United States Court of Appeals for the Second Circuit. Oyez! Oyez! Oyez! All persons having business before this, a stated term of the United States Court of Appeals for the Second Circuit, draw near, give your attention, and ye shall be heard. One more. God save the United States and this honorable court. Okay. Thank you. Good afternoon. We're hearing initially with this panel, USA v. Hunter and Stillwell, 18-3074, 18-3489, and 19-790. And let me make a preliminary statement to make sure that we're on the same page. I want to remind both parties that this hearing is unclassified. As the parties are well aware, there was extensive classified briefing conducted prior to our remand of this case in January 2021 in the district court. The parties should be assured that we have access to the full record, classified and unclassified, and have reviewed all of those materials. Based on the district court's Rule 33 order and on the supplemental briefing of the parties following that order, we do not believe it will be necessary for the parties to submit any additional classified material on appeal. If any of the parties see any issue with this arrangement and feel that they do need to submit additional classified material, they should inform us of this by letter, by no later than this Friday, March 25. And as a preliminary inquiry, I thought I might ask, it will come up by one or another of us, is the government represented by anyone here other than the Assistant U.S. Attorneys for the Southern District of New York? Do we have the pleasure of the presence of anyone from Washington? We do not, Your Honor. Were they invited or did they know of the hearing? They were not invited. They were aware of the panel's decision, but they don't know about the specific hearing date. That's part of the problem here. These are people who parachuted into this proceeding at some point, and it's a disappointment. We probably should have asked that they be here. It would be helpful to you and to them and to the world. All right, let's hear from counsel. May it please the Court? My name is Robert Boyle, and along with Andrew Patel, we represent the appellant, Joseph Hunter. And just preliminarily, Your Honor, nothing that I will be – everything that I will be saying in terms of the nondisclosed materials is in the public record, and I don't intend to go into anything, even tangentially, with respect to that. And also, subject to any questions from the Court, I'm going to be focusing my remarks on the materiality aspect of the Brady claim for Mr. Hunter in the time that I have. Under this Court's decision in pain, while it accords the District Court's ultimate finding great weight, this Court does conduct an independent review of whether Brady has been violated, whether there's been nondisclosure, and whether the nondisclosure is material. Relevant to this case, Brady, of course, covers information that impeaches a government witness. Where the suppressed information is impeachment, it is material if it impacts on the credibility of a key witness and which undermines a critical element of the prosecution's case. This is true here. The critical element here, and really the only defense at trial, was whether the appellant, Joseph Hunter, entered into or participated in the charged conspiracies while physically present in the United States. The evidence on this point, at best, was weak and even legally insufficient, as I argued in my main brief. Paul LaRue's testimony was, however, important on this point. He testified at trial that as of mid-October of 2011, Adam Simea, co-appellant, agreed to be part of the so-called hit team. He also testified that a second person, whom the government alleges was Mr. Stilwell, also agreed to be part of that team. This is important on the critical element because as of mid-October, Simea and Stilwell had not left the Carolinas. Therefore, the implication is that there must have been a meeting that Joseph Hunter attended in the Carolinas, which provided jurisdiction. Ultimately, the government would argue, provided jurisdiction. Now, Mr. LaRue did testify that he lied at initial interviews in 2015 when he said that But after his cooperation agreement, he changed up. And the withheld materials and nondisclosed materials is material, nondisclosed information is material for this very reason. We would have been able to show that Mr. Hunter was a master at manipulation and that he was bribing officials in the Philippines. He was going to divorce his wife, not because they were breaking up, but because it would give him some legal advantages. We would have been able to show that his change of testimony from saying that Simea and Stilwell didn't know the purpose of the trip to his version at trial and in 2018 was just another instance of him manipulating the system. Now, of course, some of this came out at trial about other instances where he provided bribes, but it does not render this claim cumulative because we would have been able to show a pattern and we would able to argue to the jury that his change up of his testimony was part of a pattern of manipulation and putting his own interests ahead of those of impeachment of him and his credibility. The credibility that he in fact said that obviously a meeting took place if Simea and Stilwell knew the purpose of the trip to the Philippines. Let me ask you, I understand how some of this impeachment might have inured to the benefit of Stilwell, something we'll hear more about, but it's not so clear as to Mr. Hunter without a several steps in the process and the district court pointed to various other evidence unlinked to, not linked to, the witness that implicated your client's knowledge in the United States, specifically the testimony of Van Vakias about the December 2011 call in which your client informed him that he was in the United States to meet with Simea and his guy about the bonus job. Now since there was also evidence that Mr. Hunter was already one of LaRue's mercenaries as early as 2009 and had committed other murder conspiracies, it seems to me rather strong evidence that the bonus job was the murder he ultimately committed in the Philippines. So to that extent, I'm not sure that there is much prejudice in this failure of disclosure at least as far as Mr. Hunter is concerned. What am I missing here? Well, let me address Mr. Van Vakias. Mr. Van Vakias testifies that his phone rings and he sees a Kentucky area code. He then calls back that number and allegedly Mr. Hunter gets on the phone. Let's assume for a minute that his testimony is true and then this conversation that the court referred to takes place. As we must, right? Well, in a Brady claim, I think it's a little different than a legal insufficiency claim. But anyway, let me hear your argument. Sure. But if there's a Kentucky area code, it could have been from anywhere in the world if Mr. Hunter is using a cell phone. It would still come up being a Kentucky area code. And Mr. Van Vakias also says, notwithstanding this purported conversation, that he doesn't know whether that meeting in the Carolinas ever took place. And this is at... Did I misunderstand? I thought Hunter told Van Vakias that he was in the United States to meet with Simeon, his guy, about the bonus job. It wasn't just a matter of the cell phone having a United States number on it. It was that he said that he was in the country to meet. He said he was with his family in Owensboro, Kentucky, which is not the Carolinas. No matter. It only has to be in the United States, right? And he said that he was here to meet with Simeon, his guy, about the bonus job. The bonus job is the quote from the testimony. He would have to be in the United States and enter into or participate in the charge conspiracy. And I'm suggesting to you that he's basically made an admission that that's why he's here. Am I missing something? The only thing the court might be missing is that that all takes place when he's saying he's in Kentucky. There's never an admission that he ever got to the Carolinas where he would have met with Simeon and still well, and then allegedly enter into the conspiracy. So I would respectfully submit that that notwithstanding what he said, even if we believe that it's true and a lot about Van Vakias is not true. The simple fact that he called him from Owensboro, Kentucky, and said he might do another meeting is, is not so so important as to discount the Brady material that we're here to say was was material. It's not he didn't get on the phone and say, I'm in Carolina with with the two guys having this meeting. He said, I'm in Owensboro, Kentucky. And Van Vakias is very clear, saying he doesn't know whether he ever got to the Carolinas. And, you know, interestingly, and, you know, there's the airline records. That the government relied on a trial, which a government witness, a member of the Customs and Border Patrol, says Mr. Hunter was not on that plane. Mr. Hunter was not on that plane. And there's and this is a this is a U.S. government agent and that he was not encountered by by customs on that trip. And interestingly, there's no evidence at trial of a return trip by Mr. Hunter out of the United States. So if he came to the United States at some point in this particular period of time, there would also be a record that he went back to the Philippines. And we know he was in the Philippines by at least as early as January of. It would be 20. It would be 2012. So the evidence that he was in the United States and entered into a participated in a conspiracy, I would respectfully submit, is is weak. Therefore, making the undisclosed material, the undisclosed information material under under Brady. Thanks, Mr. Boyle. You've reserved some time and I've given you some extra time and grateful for it. Thank you, Your Honor. Thank you. Thank you, Mr. Ray. Thank you. May it please the court. Robert W. Ray, Zeichner, Ellman and Krauss for dependent defendant appellant, Carl David Stillwell. This is the appeal following remand of the denial by the district court of Stillwell's motion for a new trial. And there are just two issues, as the court understands, following this court's 2021 remand order. The first is whether the government suppressed the material that is the classified information. And second, whether defendants suffered any prejudice, whether it was material as a result. And on the first issue, the parties now seem to be in agreement over one thing. The preferred course, as the government now acknowledges, is for relevant classified material in this instance to have been by the Narcotic and Dangerous Drug Section in Washington, D.C. And what flows from that is then the statutory scheme, which is the Classified Information Procedures Act, which deals with this. But that statutory scheme can only work if there's timely disclosure. Now, much of the focus in the district court on this question of suppression was on D.E.A. And the government's continued efforts to try to parse D.E.A. into smaller and smaller pieces to avoid the fact that D.E.A. is, in fact, an agency. And their argument seems to run counter, we would submit, to the Supreme Court's decision all the way back to Giglio, which involved the U.S. Attorney's Office. No argument was countenanced in that case to say, well, it's a different unit of the U.S. Attorney's Office. Therefore, if one part of the U.S. Attorney's Office is unaware of material that another part of the U.S. Attorney's Office knows about, the government can escape its disclosure obligation. Is that the apt analogy, or is this more like the Justice Department has 94 U.S. Attorney's Offices and there's case law that says one does not necessarily have to know what the other is doing? But, Judge, I think you have to be careful about that. Well, but to continue, and then I do want to hear from you, Mr. Wray. You know, the D.E.A. has field offices, different departments, et cetera. I think that's their argument, whether it persuades or not is another matter. But tell me why you don't think it should. Well, I'm analogizing it to 94 U.S. Attorney's Office. I mean, we acknowledge Quinn, this court's decision going back really to the beginning of all this, although it precedes Giglio. But, you know, Quinn, sealed material in another district of one of the 94 districts shouldn't be within the purview of the prosecution team. And if they're not aware of it, particularly sealed material, they can't be held accountable for it. That part I get. But it's a little different here. We're talking about the witness, Paul Rowe, who belongs in that sense in terms of the government. He's a cooperating witness and who was activated to continue to do investigations. He therefore had a D.E.A. informant file. Somebody at D.E.A. had overall knowledge both with regard to the classified material and also with regard to the pendency of this case in the Southern District of New York. And I've tried to make the argument, Mr. Hunter's counsel has really focused more on, you know, carving up D.E.A. into smaller pieces. If you don't like that argument, Judge Raggi, I believe the correct course here is to be more practical about this. And that was to hear from the Narcotics and Dangerous Drug Section, who is best positioned since they had access to the classified material and nobody else did, as to what to do with it. And if you're going to place a disclosure obligation on anybody, it seems to me it should be on the Department of Justice and specifically the Narcotics and Dangerous Drug Section to make timely disclosure at a meaningful time where the district court can make appropriate decisions about whether it gets disclosed, whether the classified material can even be used in a court proceeding and so on. Do we have anything in the record in this case as to when that office learned that there was a trial going on in the Southern District of New York? Well, we don't, but it looks like from what I can tell after hours spent, and again, we didn't hear from the Narcotics and Dangerous Drug Section and neither did you. There's no affidavit from them that was submitted in this case, Your Honor. I see that my time is up, if I just may respond on this point. There's no appearance by NDDS in the Southern District of New York. I can tell by when it looks like the classified material became classified that it was very shortly after the trial. And it also seemed that the actions taken by NDDS tracked the significant events in the case, their initial disclosure coming around the time that the motions for judgment, notwithstanding the verdicts, were in place in the district court. They then seemed to track the fact that I filed a notice of appeal, and then shortly thereafter they notified this court. So it's clear. That all suggests that they may have only learned about the trial after the verdict was rendered, and I'm not sure whether that should play a role in our identifying a disclosure obligation by them. You know, you're saying it wasn't a timely disclosure. That would be before trial. I can't speculate as to that. But if they didn't know about the case. I can only say from the record that there were classification activities that would appear to have occurred in May following the trial that concluded, I believe, in April. Right, that had concluded. Right. So, I mean, I don't know whether, I can't say that there weren't or there were activities prior to that time. And wouldn't, since we did remand it, wouldn't it have been the party's obligations to develop that in the district court if they thought it was pertinent? We didn't have any access, obviously, to the narcotics and dangerous drugs section, and the government submitted no affidavit with regard to that issue. We had the ability to ask the government to make disclosure of that fact if it were pertinent. My problem is we don't know. And so how do we view that gap in the record when the parties, I think, had the opportunity to get it clarified if it was important? Well, the only opportunity that we had was an oral argument that was in a classified setting before the district court. We didn't specifically ask for that. But on the other hand, the legal issue was that the district court's position and the government's position was that it didn't need to hear from narcotics and dangerous drugs section because they were not absolutely part and had no involvement in the prosecution of this case. They were not part of the prosecution team, and that under the law you could not impute knowledge to them with regard to a disclosure obligation. So it didn't become a factual question that we could have explored because the case turned on entirely a legal issue, which is the reason why in this court I'm arguing that this is not subject to anything other than de novo review, at least with regard to that particular issue. Now, if I may, Your Honor, just on the materiality, and I understand time is short. Go ahead. On the materiality issue, you know, we set forth, I believe sufficiently in the district court, a non-speculative allegation with regard to perjury. That was a prima facie showing. The government now argues in the district court's decision, seems to essentially take this thrust as well, that we couldn't exclude other possible inferences as to what, for example, quote, unquote, candles or throwing away candles in the river as a reference to the murder weapon might be. And again, in the absence of any affidavit from the witness, Paul O'Rourke, and we didn't have the ability to get such an affidavit. We don't have any access to Paul O'Rourke. In fact, the government has essentially made Paul O'Rourke disappear in the federal system for reasons that they can address. I have no information one way or another. But we clearly don't have the ability to go running around chasing after Paul O'Rourke's affidavit. But that issue is critical. The value of the candle's evidence is that it would have allowed you to argue if he lied about that, he lied about other things. It's not that the candle's evidence itself is in any way exculpatory. That's correct, Your Honor. Okay. I just wanted to make sure. What is exculpatory is the Brady disclosure from 2015. And the case turns on. If Paul O'Rourke was originally telling the truth, that he didn't think that David Stilwell had knowledge of the trip before he went to the Philippines, and I will say parenthetically, Judge Radji, that was Tim Van Vakias' position. He testified at trial. That is, he got pulled into the conspiracy. He didn't know at the point at which he was originally drawn into the conspiracy that the purpose of his security work was going to also include murder in the Philippines. And so our argument was to try to make it apparent to the jury that they could not conclude beyond a reasonable doubt that Stilwell had knowledge before he left for the Philippines from the United States as to what the purpose of the trip was. And so, Your Honor, Judge – He's on the website about murders, though. He is. I mean, this is pretty strong evidence that, you know, he's got a – before he leaves, he goes into the folder, HITMAN, and looks at recommendations for how to commit murder. But I think the district court acknowledged that there wasn't any direct proof that he actually reviewed that material before he left for the Philippines. I think the best that could be said is that he may have reviewed it once he got to the Philippines. And so the question, again, is can you make the inferential leap to believe that Mr. Stilwell, beyond a reasonable doubt, on a critical essential element of the case, knew. Did I misunderstand? I thought he accessed it in October 2011. Is that a mistake on my part? I think the information is that it was downloaded and it made its way onto the computer at that time. There's no indication that he actually reviewed the material. And so that was the question, the issue that the district court acknowledged might well be the case. And so the evidence there was fairly weak. The most important evidence, though, is the jury came to the conclusion that Paul LaRoe was telling the truth originally back to 2015, in other words, the original Brady material. There's no way they – even given that evidence, Your Honor, there's no way the jury could have concluded beyond a reasonable doubt that Stilwell had the requisite knowledge of intent in the United States in order to commit this crime. And for all those reasons, we argue that the case should never have even gone to the jury. But separate and apart from that, on this particular issue, Your Honor, I do think that it was a closed case. I do think we can establish perjury. I think all we had to show that was a non-speculative allegation of saying, which I think we did make, and it was a sufficient showing to have called for a hearing, which is all we're asking for. And I think the absence of any affidavit from LaRoe, as well as the absence of anything from the narcotics and dangerous drugs section, means that there's more to do here before this issue can be resolved. Those are the issues that should have been addressed at the hearing. We don't even get to a hearing, as I've indicated, until the first question is answered as to whether there's government suppression. I think the law with regard to that is, you know, arguably ambiguous on this particular point. But I think within the area of classified information, Avelina was the controlling decision. It says not in all instances will there be an imputation of knowledge. We think this is one of those instances where it should be. I understand it's an exception. I understand this is extraordinary. This is an extraordinary case. That's how you handle classified information. But let me ask you about what you're looking for from us. You're asking either for a remand to the district court for a new trial or, in the alternative, a remand to the district court for an evidentiary hearing, right? Correct. And what kind of a hearing? Just describe briefly what that hearing would look like. Well, in the first instance, I don't know what LaRoe knows or didn't know, and the district court correctly pointed out that there's been some considerable passage of time here. Remember that the murder was committed in 2012. Here we are 10 years later in 2022. But I think arguably the hearing, at least if it's involving LaRoe, would answer that question. Mr. Hunter has made a related argument for a hearing on the suppression question, which would get into the question of what NDDS knew or didn't know at the relevant time to answer Judge Radji's question. I don't know whether or not they knew anything before May of the trial year, but that's something that could be explored at a hearing. So that's the other aspect of it. You had a long hearing. Did you not before Judge Abrams on remand? We're going to be there anyway, Judge, because, as the government has already acknowledged, there's got to be a resentencing as to all three defendants in this case as the result of an intervening Supreme Court decision. So when your honors decide the underlying merits, we don't know what your honors will do, but we know at a minimum there's going to be a remand. I'm suggesting, since there's going to be a remand anyway, that this issue could be dealt with expeditiously in an appropriate way. I think we've found sufficient cause on both of those issues as to why a further hearing is appropriate. Well, what exactly took place before Judge Abrams on this initial remand? There was submission of additional briefing, specifically on the motion for a new trial. So we filed our form of motions within the time constraints. The district court ordered a briefing schedule, and then after a letter to the district court after it had been pending some time, I requested specifically a status conference. As a result of that status conference, the only substantive thing that happened is that there was oral argument in a classified setting on the pending motion for a new trial. But there was nothing else, and we did make a request for a hearing, so that issue's been preserved before the district court. You asked for more than what you actually had been given. Correct, and that was denied as a result of the district court's subsequent decision, which was issued at the end of last year. Yes, Your Honor. Thanks very much. Thank you, Your Honor. All right. Good afternoon. May it please the court, my name is Rebecca Donaleski. I'm an assistant United States attorney in the Southern District of New York. I represent the United States on appeal, as I did in the district court below. Could you lift up the microphone a little bit? Is that better, Your Honor? Yeah. Thank you. I think if you lift the podium, you'll find it easier, too. There you go. This is not the first time this has happened to me. Thank you. Your Honors, I'd like to start with materiality, because as the district court correctly found and did not abuse its discretion in finding, even if the materials were suppressed, which they weren't, and I'll speak about that in a moment, but even if they were suppressed, the defendants were not prejudiced, and the panel can resolve this motion on this issue alone because the materials were not material. And so before I speak about materiality, let me frame it. To the extent that they're not material or to the extent they're impeachment, they're cumulative? Both, Your Honor. So first, to frame the issue, this is a case where both of the defendants conceded their participation in the murder. The only disputed issue was the jurisdictional one. So when we're speaking about materiality, the question is, is it material? Is this impeachment material to that question, the jurisdictional question? And so here, the district court found, first, that LaRue's testimony was not material to the jurisdictional question. And Judge Raggi, I believe you pointed this out, but the district court found that LaRue's testimony wasn't critical because of the other numerous independent pieces of evidence in the record that established the jurisdictional evidence. So I'd like to start with Hunter. The district court detailed the other evidence, including emails referencing a murder-for-hire conspiracy in 2009, Hunter's own admission of smuggling cash into the United States during the pendency of the conspiracy, Hunter participating in recruiting for the kill team in 2011 and 2012, and, of course, the testimony of Timothy Vemvakis, the cooperating witness, about this call in late 2011. And, Judge Raggi, you had asked counsel for Hunter about this, and you had pointed out that the call is within the United States. Hunter told Vemvakis, I'm in the United States, and he described an intention to meet with Sammy and Stilwell. That call alone, it's one of many pieces of evidence as to the jurisdictional question, but that call alone shows that Hunter was within the United States participating in this conspiracy, which is what the government had to prove. I think if I understood your adversary's argument, we are supposed to be concerned that when he has that call, he hasn't joined the conspiracy yet. He's planning to, but he hasn't formally joined. Do you want to tell us why we shouldn't be concerned about that? Absolutely. The evidence showed that Hunter joined this conspiracy in 2009. By 2009, he had already participated in firebombing, shooting, and kidnapping on behalf of this conspiracy, which was directed by Paul LaRue. So by 2009, he had already exchanged the emails with David Smith and Adam Samia regarding the, quote, serious thing in Africa and doing cleanup jobs for which he would be paid $25,000. So what is the conspiracy that you're saying he joined in 2009, a conspiracy to do what? To murder and kidnap abroad in violation of 18 U.S.C. 956. So you're saying there's an overarching conspiracy and it doesn't matter about individual victims. Exactly. Catherine Lee was one of numerous victims of this conspiracy. So the fact that Hunter had a call in 2011, as the district court found, you can put that to the side. There are a number of other independent pieces of evidence that don't depend on Paul LaRue's testimony that show that he participated in the conspiracy starting in 2009. I'd like to next talk about Stilwell. The district court likewise found that Paul LaRue's testimony just wasn't critical to the evidence of Stilwell's participation in the charge conspiracy in the United States. I'd like to start with the interesting stuff folder, which, Your Honor, Judge Radji, you spoke about with Mr. Ray. Now, Your Honor is correct that the evidence at trial showed that Stilwell accessed the interesting stuff folder and accessed a number of files within that folder, although he didn't access the, quote, hitman file that contained detailed instructions about how to murder someone in the exact same way that Catherine Lee happened to be murdered several months later. But Stilwell did take the laptop with the interesting stuff folder and with the hitman instruction guide to the Philippines with him. That is one of several independent pieces of evidence that Judge Abrams noted established the jurisdictional element as to Stilwell. I'd like to next speak about the district court's finding that this impeachment material was cumulative. Paul LaRue is a unique cooperator. This is someone who Judge Abrams described as a James Bond villain. It is impossible to overstate the extent to which this cooperator was impeached by the government, by three different defense attorneys over two days of trial testimony. This is someone who was impeached at length about his participation in eight different murders, in developing defense technology for Iran, in buying off judges, in raising his own army to foment a coup. This is someone who has cross-examined at length critically about the 2015 lie that Mr. Ray was speaking about earlier, the lie that LaRue told about whether or not Stilwell had knowledge of the purpose of the trip before he left the United States. The defense attorneys had an opportunity to cross-examine LaRue extensively about that lie and critically about the same pieces of evidence that the appellants now argue that classified materials would lead to. So, for instance, LaRue's management style, LaRue's obstruction of justice, LaRue's lies to the government. These were all well-trodden fodder for cross-examination, and so the district court rightfully found that they were cumulative, and cumulative impeachment cannot be material under this court's guiding law. I'd next like to turn to suppression. Judge Cronin, I believe you asked questions about NDDS's role and whether they know about this. I'd like to return to the fact that this court's law tells us that we need to look at what people did, not who they are. And so while SDNY would have preferred that NDDS had disclosed this to us, and while I can represent to the court that we, in our leadership in our office, have told the leadership of NDDS that we do not want them to do this again in any SDNY case, and the message has been received, the point is, as unfortunate as that particular decision by NDDS is, they're still not a member of the prosecution team. Judge Abrams found, and her factual findings were not challenged seriously below and are not challenged here, she found that NDDS had no relationship with the prosecution team, no joint investigation, no coordination. So when Stewart tells us we need to look at what someone did, NDDS undisputably did nothing. I'm sorry. Did they know about the prosecution in the Southern District before, I guess, I think, counsel said the motion for a new trial? The record doesn't include that information, and, Your Honor, I personally do not know that information. This was not developed in the district court below because Judge Abrams correctly applied this court's precedent in finding that we need to first look at what they did, and because they did nothing, they're not members of the prosecution team. Well, let me ask you whether that is a view of the government's obligations that we should adopt here, and I'll preface it by saying that nothing I ask you is meant to be critical of your office. Your office only learned about this because we ordered that you be informed about this, but you are here for the government, so I have to ask you this question. If the folks in Washington had had the sort of Brady material that was truly exculpatory that would have revealed that one of these defendants absolutely was not guilty, is it the government's position that they had no obligation to do any, that the government, writ large, had no obligation to do anything because they weren't part of the prosecution team? That's disquieting. I completely understand that, Your Honor, and that's why our office has asked NDDS to not do that again. But we deal with this case and whether due process was afforded in this case, so I'm just asking you how far this not part of the prosecution team argument can carry you. Your Honor, when one looks at the prosecution team jurisprudence in this circuit, the value of obliging only the prosecution team, only the people and agents who know the facts, who are in charge of prosecuting the defendant, the reason that that works is that it is an objective standard. But we're dealing with an unusual circumstance where there is another part of the government that is deliberately keeping you in the dark. And just to carry this further, and at the same time when all of the dust settles, comes knocking on the district court's door and wants some kind of order protecting their nondisclosure and then comes to our door and wants the same thing from us, which raised concerns as to who was speaking for the government. So to that extent, they weren't part of your team, but they wanted their actions shielded by the courts that were doing this. And I'm suggesting to you that that may require a rethinking of who's got disclosure obligations, if not you all as the prosecutors of record, these other folks who are keeping you in the dark. The problem with that is it presupposes this monolithic view of government that is unworkable, and I think Avelino speaks to that. So to give an example, there are aspects of our government, of our entire bureaucracy, that are tasked with collecting information, right? And so let's say one of those agencies has information about a criminal case. To take your Honor's concern to its conclusion, are we then going to say that every aspect of the government, every person who has a subjective knowledge of this particular criminal case, they now have an obligation to come forward? That's not workable. We don't have to go that far in this case. We're talking about the same agency that handled the prosecution, just different department of the same agency. We don't have to consider whether the Department of Agriculture or the Department of Housing and Urban Development's knowledge of certain facts had to be disclosed. I mean, we're talking about the same agency. Why can't we go at least that far? Because the court has been faced with this question before and has determined that the prosecution team is an objective, definable unit, and you can't simply say that because SDNY and EDNY are both under the Department of Justice and are both U.S. attorneys' offices, that anything that is known by SDNY is imputed to EDNY. That specific question has been asked and answered in the negative by this court. And so to say that simply because one aspect of the DEA knew something, that knowledge is imputed to the rest of the DEA. Well, we're talking about a part of the DEA which, as Judge Raji suggested, they felt they were relevant to this action. I mean, nobody invited them here, least of all the Southern District of New York. I mean, no one invited them here. Suddenly they surface. They believe that they have something to do with this case for some reason. We don't know why, necessarily. So why shouldn't we consider them as at least relevant to the inquiry that we have here? Because the problem with that is it's a subjective analysis. It's a subjective inquiry. It is asking for someone who believes that they are relevant but has no relationship with the prosecution, no involvement in the prosecution, are we now going to obligate anyone within the government, anyone within the department, anyone within the unit? Well, not anyone. Not anyone. It's a quite particular group of people who believe that they're somehow relevant to all of this. Otherwise, they wouldn't be surfacing here, much less keeping it secret from their own colleagues in the Southern District of New York. But the point is they believe they were relevant to what was going on here, right? At some very general level. I think there's nothing in the record from which we can ascertain why NDDS did what they did or what relevance they believe that they had to the question. The question is were they part of the prosecution team and are these facts the best vehicle to dramatically expand this court's decades-long jurisdiction? Well, why is it so dramatic to take your Eastern District, Southern District hypothetical that you alluded to before? Suppose someone in the Eastern District comes upon evidence that they know it constitutes Brady material with respect to an investigation or prosecution ongoing in the Southern District. Why shouldn't they be obligated to disclose it? A couple issues with that. So first, the prosecution team model works because those prosecutors are best positioned to know what is Brady, to know what is material. And to take your hypothetical, it would commit the government to a state of paralysis because it would require anyone within EDNY who happens to read the newspaper or read a press release and think, oh, I don't know if this is Brady, but I still have an obligation to disclose it. No, but you're changing my hypothetical. My hypothetical assumes that they know. They know. They know that this, either from a witness or from an agent, they know that this constitutes or would constitute Brady material in a prosecution or proceeding in the Southern District. Why shouldn't they be required to disclose it to the Southern District? This is not the whole government. Or vice versa, for that matter. I mean, I don't, it's just troubling. I know that you're, the way you're trying to cabin this, but the question is should the test be broadened in some way to include a circumstance where another agency of the same branch of the government, in this case the Department of Justice, is aware of a prosecution or an investigation ongoing in a U.S. attorney's office and has information that would suggest that could be considered Brady material. It's not a, it doesn't strike me as being such a broad extension. I think the question then becomes, setting aside the fact that other cases have said that the prosecution team is cabin to the particular U.S. attorney's office and the agents on that case, but taking your hypothetical, Judge Korman, the difficulty is what does that look like then for the prosecution team in the Southern District? Are we supposed to take a poll of everyone in EDNY? How do we satisfy our obligations? You don't need to satisfy your obligations by what you know. No one is suggesting that you have to do a nationwide poll. The question becomes is a district U.S. attorney's office in another district knows, and should they be obligated to tell you? I'm not suggesting that you have to conduct a poll of all 94 or 96 U.S. attorney's offices throughout the country. I think the problem then is are we, what obligation are we placing on people who have nothing to do with the prosecution? And that is a difficult line drawing exercise to draw. Judge Cabranes has suggested it to you. They came to these courts, to the courts that were involved in this case, and wanted their actions sanctioned. So in Judge Korman's hypothetical, if the prosecutors from the Eastern District came across the river and asked a district judge to sanction their not telling you certain information, and then on appeal we decided that was wrong, I'm not suggesting that the Southern District would have done anything wrong in those circumstances. I'm only asking you whether the defendant's rights have been adequately protected, if that's how two parts of the government acted. And, Your Honor, I would answer in the affirmative that they have. These facts are not anything that anyone would prefer. That is, I think we all agree on that. But the point is, what does the circuit's prosecution team jurisprudence say? And this circuit has said that it is adequately protective of a defendant's due process rights to limit the prosecution team to those who actually participated in the prosecution. It is unworkable to impose on anyone else who may subjectively believe that they should be involved or may subjectively believe that maybe this evidence might be helpful. That is a very difficult, non-objective line-drawing exercise to engage in and one that is contrary to decades of what this Court has said. Some might think that this is such an unusual circumstance that was certainly not envisioned when any of those cases were written and that the way to deal with it is that the Department of Justice, right up to the Attorney General, makes clear that this kind of concealment of information from a prosecution team is not to be tolerated. And, Your Honor, I can represent to you that that message has been delivered both to the Department of Justice and to NDDS by the executive leadership of our office. And there was one additional disclosure that happened after this panel's opinion came down in a pretrial posture. So the message has been received and the facts of this case simply do not justify overturning decades of this circuit's jurisprudence. Well, that may get to your materiality issue and that's another part of the argument altogether. Thank you. Let me move from the big picture here that we're considering to a very small picture. How large is the DEA Special Operations Division? Do we know? It's not in the record, Your Honor. It is based in Virginia. I can represent to you, Your Honor, that it is hundreds of agents. There are different organizations and the record actually reflected in the district court in one of the affidavits. The record reflected that there are different supervisors for the Special Projects Section. In the record before the district court, is there an answer to this question about the composition of the DEA Special Operations Division? In the Maxwell Declaration, there is an answer to the organization of the Special Projects Section vis-a-vis the Bilateral Investigations Unit, which was part of the prosecution. So we don't need to supplement the record in your view in that respect? No, Your Honor. Okay. So let me go to the next micro question. Without an evidentiary hearing, what confidence can we have that the DEA BIU personnel on the prosecution team did not have access to the classified materials? Your Honor, in the Bovee Declaration, which was before the district court, that question is addressed. And I'm hesitant to go much further than that. When DEA came to the district court and then when it came to us, part of the application was not to have to tell you, right? That is correct, Your Honor. Okay. Which at least supports an inference that you didn't know. I believe if Your Honor wants to refer to both affidavits, they explain the extent to which we were not immediately granted access even after the court's opinion. Yeah. Okay. Thank you very much. Thank you, Your Honor. Mr. Boyle, if you reserve some time. Thank you, Your Honor. With all due respect to the court's prosecution team's jurisprudence, I think we should take also a look at Kyles v. Whitley, which says this prosecution is presumed to have knowledge of facts developed by the investigating agency. Right. But presumptions are, they can be defeated here. They certainly can, Your Honor. These folks showed up in court and said, we want this kept quiet and we don't want to tell the Southern District about it. That's basically what they said. You want us to presume that the Southern District knew about this classified information when the folks from Washington are telling us they don't want to tell them? Not presume that they had actual knowledge, but legally that they're chargeable under Brady with the knowledge of that material. Not that they had actual knowledge. No, of course not. But that takes us into all the precedent that the government wants us to rely on about one office isn't presumed to know about what another office is doing. I mean, that case law, as it presently stands, does not help you. The prosecution team case law, I would submit that it's different in each case. What's the prosecution team? A prosecution team in a buy and bust on the street is going to be different than something, for example, investigating Paul LaRue. All right. So why do you think that this isn't a case against Paul? No, this is a case against your client. Now, why are we seeing these folks in DEA in Washington as part of the prosecution team? Because the DEA BIU, which we know was the center of this particular prosecution, and the DEA, I think it's SPS, were part of the same subdivision of the DEA SOD. So they're all we're not asking here that the entire DEA be considered to be part of the prosecution team. This is a subdivision, the same subdivision. And certainly also in Kyle's. But there's a duty of inquiry. And I'm not saying that they have to survey every federal agency, every U.S. attorney's office. But when something is in the same subdivision of an agency, you can do a name search and come up with information. And I think that that's all we're all we're saying here. That wasn't done. And it should have been. Can I ask you, I believe the assistant U.S. attorney said that the record is silent as to when the DEA unit became aware of this investigation slash prosecution slash trial. Why didn't you ever ask or did you ever ask? Well, we we asked at the oral at the oral argument, we asked for a hearing. And that would have been one of the issues, obviously, that would have been would have been addressed. Obviously, it would have been here. You needed a hearing in order to develop when they learned about about there being a trial in this case, because I didn't see that. I believe that we requested a hearing as to the whole issue of whether it was suppressed, not not the particular issue that this specific issue. See why I'm concerned about that is it might not have been necessary for a hearing. They might the court might have said, I want an affidavit from somebody in the department as to when they learned that there was a trial in this case. Depending on what they said, you might have said you wanted an evidentiary hearing. You weren't prepared to accept. I mean, if they filled out and if they submitted an affidavit that they knew about it three weeks before trial, you've got a stronger argument. But nobody ever said that to the district court. I'm troubled by that. No, no one ever made that specific request, Your Honor. But certainly we we know now that we're short at the latest shortly after conviction and before a judgment was entered. That doesn't tell you about it. All right. We know that. Thank you. Thank you, Mr. Ray. I believe Mr. Hunter's counsel's point relative to this question of what was asked for at the hearing is in footnote three of his submission to this court. So without delaying things further, I just referenced that. And with regard to Judge Corman's point, look, if there is a major exculpatory Brady issue in another district, I assume that the constraining principle among prosecutors is their law license, which is to say if they've got access to Brady information with regard to a pending proceeding, they need to disclose it under their professional obligations as lawyers in the first instance. And so I do think your honor is correct. It doesn't necessarily look. You're not obligated. You could argue that whatever the current state of the law is in the definition of the prosecutor's office, it should be extended to a unique circumstance like this. I think that's if we have to overrule any case. You don't. That was my next point. I think there does need to be a rethinking here. But it is actually consistent with the four leading case in this circuit in the area, which is Avellino. Avellino says that not in all circumstances do you impute knowledge to the prosecution team. This may be one of those limited circumstances with regard to just the situation involving classified material where there's something extraordinary going on. And to Judge Raji's point, I just want to be clear that, you know, there was a decision made here with regard to this classified material. Please recognize the context. The recordings were made back in 2012. Lots of years pass until we get to 2018 when there is a trial. And I'm suggesting that all I know are the outward manifestation of activities by the Narcotics and Dangerous Drugs Section to suggest that they took some kind of action right immediately after trial would suggest possibly, I suggested this in the district court, that there was activity underway beforehand. We're not going to know for certain until either you have affidavits from them or you have a hearing before the district court. That was my only point in that regard. But it's not, what I'm trying to suggest is that the context is not accidental, Your Honor. It happens in the same year, six years after the recordings were made. That cannot be, I argue this in the district court, that cannot be a coincidence. So, you know, do we make the specific argument to inquire as to when those activities started? No. But I clearly made the suggestion that they were underway by May of the immediately following the trial that suggests that they had to have been underway beforehand. And if there were any remaining issues with regard to that question, that obviously would be what a hearing would be for. Thank you. That's all I have. Thank you very much. Thank you very much, Mr. We'll reserve decision and we are in recess.